[S. F. No. 18639.   In Bank.   Aug. 18, 1953.]

GLEN D. NOLAN, Petitioner, v. PUBLIC UTILITIES COMMISSION et al., Respondents.

Marquam C. George for Petitioner.

Everett C. McKeage, Boris H. Lakusta and John K. Power for Respondents.

EDMONDS, J.—The Public Utilities Commission instituted an investigation on its own motion into the operations and practices of Glen D. Nolan, doing business as Colma Drayage. Following a hearing, the commission entered its order directing Nolan to cease and desist from operating as a highway common carrier between a large number of designated cities unless and until he obtained a certificate of public convenience and necessity. The order also suspended his permits to operate as a radial highway common carrier and as a highway contract carrier.

Thereafter, the commission granted Nolan's petition for a rehearing. Upon further consideration of the evidence, the commission entered a new order requiring Nolan to cease and desist from operating without a certificate as a highway common carrier from San Francisco to Oakland, Newark and San Jose, respectively. The new order did not suspend his existing permits. By the present proceeding in certiorari Nolan is challenging the commission's action.

The facts are not in dispute and may be summarized as follows:

When Nolan commenced operations in the early part of 1946, he applied for and received a radial highway common carrier permit. At that time, he was unfamilier with the highway contract carrier permit provisions of the statute.

Beginning with one truck and one principal customer, Nolan gradually expanded his business. At present, he operates five pieces of equipment, driving one of the trucks himself. Service between certain cities became increasingly frequent, and, at the time of the hearing, was being rendered daily from San Francisco to Oakland, Newark and San Jose.

The only evidence that Nolan ever refused a new account is based upon transactions subsequent to the beginning of this investigation. The record shows that he now has about 20 to 25 regular customers and regularly accepts shipments from others who offer them. When asked why he refused certain

accounts after the commencement of this investigation, he explained: "Well, I have been in the trucking business to go ahead, but they don't seem to want to let us, seem to run into trouble if you take too much freight, that is what they tell me."

Until 1948, Nolan operated exclusively under his permit as a radial highway common carrier. In January of that year when, as he put it, "I started hearing all this dope about a guy being out of line," he obtained a permit as a highway contract carrier. However, not until June, 1949, did he enter into any transportation contracts. Each of the 19 contracts which he secured about that time was with a shipper whom he had served previously in his capacity as a common carrier. Some of the contracts were in writing and some oral.

At the time of the hearing, by cancellations and replacements, the total number of contracts had been reduced to nine. Cancellations were accomplished informally under both types of contracts, and no attention was paid to the cancellation clause of the written contracts. Nolan testified that his operations had remained unchanged from the period before he secured his first contract to the time of the hearing.

From this and other evidence, the commission found that Nolan's method of operating his business after securing the contracts was identical with his previous service. The contracts, it said, were merely a device "to avoid the obvious pitfall of broaching into highway common carriage when the radial operation became too frequent and could no longer be described as between *un*fixed termini or over *ir*regular routes." The commission concluded that "the whole of respondent's operation manifests an unequivocal dedication to serve the public or a portion thereof between fixed termini or over regular routes." However, it limited its decision upon rehearing to a determination of Nolan's status as to those pairs of termini served daily. (See *Souza* v. *Public Utilities Com.*, 37 Cal.2d 539, 543 [233 P.2d 537].)

Nolan contends that the evidence is insufficient to sustain the finding that he is operating as a highway common carrier from San Francisco to Oakland, Newark and San Jose. He also challenges the sufficiency of the evidence to sustain the findings that the contracts were a mere subterfuge and that he held his services out to all persons receiving collect shipments. There is no basis in law, he says, for the conclusion that when the business of a radial highway common carrier grows to the extent that the termini are fixed it becomes a

highway common carrier. By its answer to his petition the commission disputes each of these contentions.

■ Nolan's argument that there is no evidence to indicate he operated as a common carrier at any time is not well founded. For two years he operated with only a radial highway common carrier permit. By statutory definition, operations under this permit could be only as a common carrier. (Pub. Util. Code, § 3516.) Even after he secured a highway contract carrier permit, he continued for another 18 months to operate exclusively as a common carrier.

■ The determinative question, therefore, is whether he removed some, or all, of his operations from common carrier status by securing contracts with certain regular customers. The finding of the commission that he did not do so is amply sustained by the evidence. Describing the expansion of his business, Nolan said: "What I have tried to do in business— I heard about being out of line. I try to operate as a radial carrier. I have spread out. I don't know where I can spread next." In response to a question concerning the difference between radial and contract carriage, he testified: "By a radial and contract carrier—well, I don't understand all these rules of the Commission, but I believe that you don't operate over the same areas too frequently. That you can operate as a radial carrier, that if you continue operating between the same points too frequently, then you better get a contract or you will be up where I am at." From the evidence, it is clear that Nolan had no intention of withdrawing his dedication to serve the public or a portion thereof as to any part of his operations. As he said: "I go wherever there is freight. If it is Saturday or Sunday and I can make some dough on the load, I take it."

The most concise summary of Nolan's reason for entering into contracts with certain shippers appears in his reply to the commission's answer to his petition. He there states: "Whenever it appeared that a shipper would ship with any considerable degree of frequency between any points, petitioner attempted to solve his dilemma by entering into mutually binding contracts, and refusing to accept shipments as a radial highway common carrier." This concession is in complete accord with the commission's finding that the contracts were a mere device to hide the fact that constantly expanding radial highway common carriage had become highway common carriage.

By posing as a contract carrier, a common carrier cannot evade the statutes designed to regulate its operations. (*Haynes* v. *MacFarlane,* 207 Cal. 529, 534 [279 P. 436].)

The status of the carrier is primarily a question of fact in each case, and the court will not disturb the conclusion of the commission upon this question when it is based upon sufficient evidence. (*George* v. *Railroad Com.,* 219 Cal. 451, 456 [27 P.2d 375]; see *Frost* v. *Railroad Com.,* 271 U.S. 583, 600 [46 S.Ct. 605, 70 L.Ed. 1101].)

The element of intent is a primary factor in determining the character of carriage. (*Samuelson* v. *Public Utilities Com.,* 36 Cal.2d 722, 733 [227 P.2d 256].) Here the evidence is abundant that Nolan intended to continue operating as a common carrier but to avoid the consequences of expanding operation by entering into contracts with those shippers whose freight he carried on his trucks with regularity to certain termini. This is sufficient to sustain the finding that all of his operations, whether by contract or otherwise, were common carriage.

Nolan's contention that a radial highway common carrier does not become a highway common carrier when business expansion results in regular trips to certain communities is without merit. By statutory definition, the distinction between the two types of carriers is that the highway common carrier operates between fixed termini or over a regular route whereas the radial carrier has no fixed termini or regular route. (Pub. Util. Code, §§ 213, 215, 3516; *Alves* v. *Public Utilities Com., ante,* p. 344 [260 .P.2d 785].)

Nolan's argument that he has no terminus because he has never established a terminal is based upon a confusion of the meaning of "terminal" and "terminus." The very definition which he quotes refutes his claim. Webster's New International Dictionary, second edition, defines "terminus" as: "Either end of a railroad or other transportation line; also the station or the town or city, at that place." Here, the evidence is undisputed that Nolan daily transported freight from San Francisco to Oakland, Newark and San Jose, the respective ends of particular transportation lines which he operated. These three cities, therefore, were the termini of daily shipments. Unquestionably, daily transportation to these cities places them within the classification of "fixed termini," those between which the carrier "usually or ordinarily operates." (Pub. Util. Code, § 215.) In considering his oper-

ations between these cities, the commission properly found that he was a highway common carrier.

■ As a corollary to his contention that the evidence is insufficient to sustain the finding that he is operating as a highway common carrier between designated termini, Nolan argues that the commission lumped his common carrier and his contract carrier operations. By this procedure, he says, two permissible types of business become illegal. However, the commission found, upon sufficient evidence, that all of Nolan's operations were common carriage and that the contracts were simply a device to avoid the effect of regular transportation between fixed termini. Therefore, Nolan is not engaged in any contract carrier operations and his claim that separate types of business were improperly combined cannot be sustained.

It is unnecessary to consider Nolan's challenge to the accuracy of the commission's conclusion that he held out his services to consignees of shipments who paid collect freight charges. In view of the fact that he accepted all shipments, prepaid or collect, as a common carrier, the determination of his status was not adversely affected by this holding.

The order is affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.

Petitioner's application for a rehearing was denied September 10, 1953.